UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SCOTT,

        Plaintiff,

                             CASE NO. 03-CV-75123-DT
                             JUDGE GEORGE CARAM STEEH
                             MAGISTRATE JUDGE PAUL J. KOMIVES

  v.

B. STONE; MICHAEL LEWIS;
BIGELOW; and TRACIE SHAW,

        Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS STONE, LEWIS, SHAW AND BIGELOW'S MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 17)

### Table of Contents

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    Background and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    Defendants Stone, Lewis, Shaw and Bigelow's Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . 3
      C.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           1.    28 U.S.C. § 1915A (Screening) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           2.    Fed. R. Civ. P. 56 ("Summary Judgment") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      D.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           1.    A factual background is helpful to understanding the issues at bar. . . . . . . . . . . . . . . . 8
           2.    The Court should conclude that plaintiff's January 26, 2001 letters attempt exhaustion as
               to the claims against each of the defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           3.    Plaintiff has produced evidence that defendant Bigelow was personally involved in the
               events underlying his complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           4.    Plaintiff's First Amendment retaliation claim survives summary judgment. . . . . . . . . . 22
           5.    To the extent it is brought pursuant to § 1983, the Court should conclude that plaintiff's
               conspiracy claim survives summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           6.    Defendants are not entitled to qualified immunity. . . . . . . . . . . . . . . . . . . . . . . . . . 48
           7.    Defendants' request for costs and fees is premature. . . . . . . . . . . . . . . . . . . . . . . . . 51

III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

I.    **RECOMMENDATION:**  The Court should deny defendants Stone, Lewis, Shaw and

Bigelow's motion for summary judgment.  (Doc. Ent. 17).

II.   **REPORT:**

A.    **Background and Procedural History** [1]

      On January 28, 2004, plaintiff filed a verified prisoner civil rights complaint pursuant to

42 U.S.C. § 1983 against defendants Stone, Lewis, Bigelow and Shaw in their individual

capacities.  Compl. at 2-3 ¶¶ 6-8.  Bernadette Stone is the former Grievance Coordinator at the

Saginaw Correctional Facility (SRF) in Freeland, Michigan; Michael Lewis is a Resident Unit

Officer at SRF; Jan Bigelow is a Resident Unit Officer at SRF; and Tracie Shaw is an Assistant

Resident Unit Supervisor at SRF.  (Doc. Ent. 17 [Mtn. Br.] at 1).  Plaintiff's claims are based

upon retaliation and conspiracy.  Compl. at 5, 7.  He seeks damages from defendants, as well as

costs, interest and attorney fees.  Compl. at 9.[2]

---

      [1]The civil cover sheet for this case is marked "possible companion case".  Other than the
instant case, plaintiff has three prisoner cases pending before this Court: (1) 01-CV-10274-DML-
CEB, *Scott v. Evans, et al.*  (2) 03-CV-75069-AJT-SDP, *Scott v. Cartensen.*  (3) 04-CV-70714-AJT-
SDP, *Scott v. Freed, et al.*  Additionally, plaintiff has prisoner cases pending in the United States
District Court for the Western District of Michigan: (1) 02-CV-00177-RAE-TPG, *Scott v. Lang, et
al.* (2) 04-CV-00029-RAE-TPG, *Scott v. Babik, et al.* (3) 04-CV-00312-RAE-ESC, *Scott v. Pitcher.*

      [2]At the time plaintiff filed his complaint, he was incarcerated at Pugsley Correctional Facility
(MPF) in Kingsley, Michigan.  Compl. at 1.  On August 12, 2005, plaintiff resided at the Michigan
Correctional Facility in Jackson, Michigan.  (Doc. Ent. 22).  Plaintiff informed the Court on August
16, 2005, that he was being released from prison on that date and listed his new address as 5325 Von
Orden Road, Webberville, Michigan 48892.  (Doc. Ent. 21).  Plaintiff's copy of my August 17, 2005
order granting plaintiff's August 16, 2005 motion for extension of time, which had been sent to the
Webberville, Michigan address, was returned to the Court as undeliverable.  (Doc. Ent. 24).
      Plaintiff's September 30, 2005 motion for extension of time was sent from Hiawatha
Correctional Facility (HTF) in Kincheloe, Michigan.  (Doc.  Ent. 25).  Furthermore, plaintiff's
November 2, 2005 notice lists HTF as his address.  (Doc. Ent. 28).
      The MDOC website notes that plaintiff is currently incarcerated at Ojibway Correctional
Facility (OCF) in Marenisco, Michigan.  *See* www.michigan.gov/corrections, "Offender Search."
                                                                        (continued...)

On February 2, 2004, Judge Steeh entered an order summarily dismissing plaintiff's complaint and revoking plaintiff's in forma pauperis status based upon 28 U.S.C. § 1915(g) and Case Nos. 97-CV-72900, *Scott v. Hinton*; 95-CV-00403, *Scott v. Johnson*; and 91-CV-00138, *Scott v. Rumsey*. (Doc. Ent. 5). The order provided that "[s]hould plaintiff wish to pursue the allegations contained in his complaint, he must submit payment of the $150.00 filing fee within 30 days. Upon receipt of the filing fee, the Court will re-open the case and review the complaint to determine whether it should be served or should be summarily dismissed under 28 U.S.C. §§ 1915(e)(2) or 1915A(b)."[3] (Doc. Ent. 5 at 3). Judge Steeh entered judgment the same day. (Doc. Ent. 6).

On February 18, 2004, the Court received plaintiff's $150.00 filing fee. (Doc. Ent. 7).

**B.     Defendants Stone, Lewis, Shaw and Bigelow's Motion to Dismiss**

On July 25, 2005, defendants Stone, Lewis, Shaw and Bigelow filed a Fed. R. Civ. P. 56(b) motion for summary judgment. (Doc. Ent. 17 [Mtn.]). First, they argue that "[d]efendant Bigelow had nothing to do with the misconduct tickets issued on January 19, 2001. Thus, she had no personal involvement and has no liability under Section 1983." Second, they argue that "[p]laintiff's conclusory allegations are insufficient to sustain a claim of conspiracy among the

---

[2](...continued)
Plaintiff has notified the Court of his change of address (Doc. Ent. 29), and the docket reflects this address change.

[3]28 U.S.C. § 1915 governs in forma pauperis proceedings. 28 U.S.C. § 1915A governs screening of prisoner civil complaints. With regard to grounds for dismissal, the statute provides: "On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--
(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
(2) seeks monetary relief from a defendant who is immune from such relief.
28 U.S.C. § 1915A(b).

defendants to issue the two misconduct charges on January 19, 2001." Third, they argue that "[p]laintiff has not sustained his burden of showing a causal connection between his First Amendment activities and the two major misconduct tickets he received on January 19, 2001, thus his retaliation claims fail." Finally, they argue, "[i]f a defendant's conduct does not violate a clearly established constitutional right, the defendant is entitled to qualified immunity."[4]

On August 16, 2005, plaintiff filed a motion for extension of time within which to file a response to defendants' dispositive motion. (Doc. Ent. 22). On August 17, 2005, I entered an order granting plaintiff's motion for extension of time and setting the deadline for a response for September 29, 2005. (Doc. Ent. 23).[5] On September 30, 2005, plaintiff filed a motion for further extension of time. (Doc. Ent. 25). On October 4, 2005, I entered an order granting plaintiff's motion and setting the deadline for a response for October 19, 2005. (Doc. Ent. 26).

On October 28, 2005, plaintiff filed a response. (Doc. Ent. 27 [Rsp.]).[6] Plaintiff claims that he "has stated a viable retaliation claim[;]" "[d]efendants are not entitled to qualified immunity[;]" and "[p]laintiff has alleged facts sufficiently establishing his conspiracy claim[.]" Rsp. at 6, 12, 16.

---

[4]On July 26, 2005, defendant Stone filed an affidavit. (Doc. Ent. 18 [Stone Affid.]). On July 28, 2005, Judge Steeh referred this case to me to conduct all pretrial proceedings. (Doc. Ent. 19). On August 1, 2005, defendants filed the affidavits of defendants Stone, Lewis, Bigelow and Shaw. (Doc. Ent. 20).

[5]As previously noted, plaintiff's copy of my August 17, 2005 order granting plaintiff's August 16, 2005 motion for extension of time, which had been sent to the Webberville, Michigan address, was returned to the Court as undeliverable. (Doc. Ent. 24).

[6]Plaintiff's response is dated October 19, 2005. Rsp. at 17. This report and recommendation assumes the response was delivered immediately to prison authorities for mailing. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that a prisoner's "notice of appeal was filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk.").

**C.     Applicable Law**

**1.      28 U.S.C. § 1915A (Screening)**

The Court is required to screen prisoner civil rights complaints *sua sponte*.  28 U.S.C. §

1915A states:

> (a) Screening.--The court shall review, before docketing, if feasible or, in any
> event, as soon as practicable after docketing, a complaint in a civil action in
> which a prisoner seeks redress from a governmental entity or officer or employee
> of a governmental entity.
>
> (b) Grounds for dismissal.--On review, the court shall identify cognizable claims
> or dismiss the complaint, or any portion of the complaint, if the complaint--
>
> (1) is frivolous, malicious, or fails to state a claim upon which relief may be
> granted; or
>
> (2) seeks monetary relief from a defendant who is immune from such relief.
>
> © Definition.--As used in this section, the term "prisoner" means any person
> incarcerated or detained in any facility who is accused of, convicted of, sentenced
> for, or adjudicated delinquent for, violations of criminal law or the terms and
> conditions of parole, probation, pretrial release, or diversionary program.

28 U.S.C. § 1915A.  "Section 1915A is restricted to prisoners who sue government entities,

officers, or employees."  *McGore v. Wrigglesworth*, 114 F.3d 601, 608 (6th Cir. 1997).

"Further, § 1915A is applicable at the initial stage of the litigation...".  *Id*.

**2.      Fed. R. Civ. P. 56 ("Summary Judgment")**

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is 'material' and precludes grant of summary judgment if proof of that fact
would have [the] effect of establishing or refuting one of [the] essential elements

5

> of a cause of action or defense asserted by the parties, and would necessarily
> affect [the] application of appropriate principle[s] of law to the rights and
> obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867,

872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)).  "In evaluating a

motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . .

and assess the proof to determine whether there is a genuine need for trial."  *Gantt v. Wilson*

*Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).[7]

The movant bears the burden of demonstrating the absence of all genuine issues of

material fact.  *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).  The moving

party need not produce evidence showing the absence of a genuine issue of material fact.

Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out

to the district court – that there is an absence of evidence to support the non-moving party's

case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party discharges

that burden, the burden shifts to the non-moving party to set forth specific facts showing a

genuine triable issue.  Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his

pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to

respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[8]  "[A] verified complaint . . .

would have the same force and effect as an affidavit and would give rise to genuine issues of

---

[7]The Sixth Circuit cited both *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) in support of this
statement.

[8]Plaintiff signed his complaint under penalty of perjury.  *See* Compl. at 4, 10; 25 U.S.C. §
1746 ("Unsworn declarations under penalty of perjury").

material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).  However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (unpublished) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the United States Supreme Courts stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).  The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a).  *Anderson*, 477 U.S. at 250.  Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**D.      Analysis**

1.      **A factual background is helpful to understanding the issues at bar.**

On July 17, 2000, plaintiff was transferred from Carson City Correctional Facility (DRF) in Carson City, Michigan to Saginaw Correctional Facility (SRF) in Freeland, Michigan.  Rsp. at 2; Mtn. Br. at 8; (Rsp. Ex. 1 ¶ 15).  He was initially assigned to the 900 housing unit.  In September 2000, he was reassigned to the 800 housing unit.  This is when plaintiff's problems at SRF began and is where the events which are the subject of this lawsuit occurred.  Rsp. Affid. ¶ 5.

Plaintiff states that he filed a substantial number of grievances (10) and proposed grievances (123) from September 2000 until his transfer from SRF in February 2001.  All of these were processed by defendant Stone.  Rsp. Affid. ¶ 5.  According to plaintiff, all of these grievances "related to an on-going pattern of abuse and retaliation from prison staff in housing unit 800."  Rsp. at 3.  Plaintiff claims that much of the treatment upon which his grievances were based was detailed in Case No. 03-CV-75069-AJT-SDP, *Scott v. Cartensen*, and Case No. 04-CV-70714-AJT-SDP, *Scott v. Freed, et al.*  Rsp. Affid. ¶ 5.

From July 2000 to October 2000, plaintiff filed several grievances at SRF:  (1) SRF-00-07-00895-28z; (2)  SRF-00-09-01051-14z; (3) SRF-00-09-01052-14z; (4) SRF-00-09-01053-17a; (5) SRF-00-09-01060-14z; (6) SRF-00-09-01082-28a; (7) SRF-00-10-01134-28z; and (8) SRF-00-10-01166-28b.[9]  On October 11, 2000, Bernadette Stone, Grievance Coordinator at SRF,

---

[9]In the February 14, 2001 supplemental declaration, plaintiff claimed that "[o]n October 9, 2000, the [SRF] Law Librarian issued a false major ticket against [plaintiff] for allegedly being 'out of place.' That misconduct ticket was issued in retaliation against grievances that I had filed against him and against Officer Williams."  (Rsp. Ex. 1 at 3 ¶ 15).

Plaintiff also mentions November 11, 2000 and December 29, 2000 false major misconduct tickets, Rsp. Ex. 1 at 3 ¶¶ 16-17; however, because of the dates of these tickets, they cannot be the

(continued...)

requested that plaintiff be placed on modified access status for 90 days based upon MDOC PD 03.02.130 ("Prisoner/Parolee Grievances").  (Doc. Ent. 3 [Compl.] Ex. 1).  Allegedly, plaintiff "filed eight grievances in violation of PD 03.02.130[.]" (Doc. Ent. 20 Stone Aff. at 2 ¶ 11).  Barbara N. Bock approved the request on October 12, 2000.  (Doc. Ent. 3 [Compl.] Ex. 1).  *See also* Compl. at 8 ¶ 35; Stone Affid. ¶ 11.

On December 21, 2000, Stone requested that plaintiff's modified access status be extended for six months (from January 11, 2001 through July 11, 2001)  Bock approved the request on December 26, 2000.  Compl. Ex. 2.  *See also* Compl. at 9 ¶ 36.

On January 19, 2001, Stone summoned plaintiff to her office and "verbally complained to plaintiff about his utilization of the grievance process[.]" Rsp. Affid. ¶ 12; Compl. at 3 ¶ 12.  Specifically, plaintiff claims, defendant Stone "complained about the amount of time it took her to process plaintiff's proposed grievances."  Rsp. at 4.  Defendant produced the hand-made envelopes in which plaintiff's latest proposed grievances had been submitted.  Plaintiff told defendant Stone that the tape used to make the envelopes "was tape placed on [his] foot lockers by staff upon [his] transfer[,]" and that "it was the same place the tape came from for the other hand made envelopes [defendant Stone] had been receiving from [plaintiff] for the past several weeks."  Defendant Stone told plaintiff "'this is going to end once and for all[.]'"  Rsp. Affid. ¶ 12.  Then, defendant Stone said that "the only way to deal with you and your grievances is to

_____

[9](...continued)
subject(s) of one of these eight grievances (filed from July 2000 to October 2000).  This would also be true of the alleged comment that Officer Williams made to plaintiff on December 31, 2000.  Rsp. Ex. 1 at 3 ¶ 18.

increase your level and transfer you to a higher security.  Maybe Judge Houk[10] will ban you from filing grievances." Compl. at 4 ¶ 14(a); Rsp. Affid. ¶ 12.

Stone "then met, consulted and struck an agreement with [d]efendants Lewis, Bigelow and Shaw to issue, cause to issue, and aid in issuing [two major misconduct] charges [for possession of dangerous contraband]."  Compl. at 3 ¶ 12.  Plaintiff claims that on January 19, 2001, after defendant Stone dismissed plaintiff from her office, he went to the housing unit:

> [He] was met by [d]efendants Lewis, Bigelow and Shaw. [He] was instructed not to report to [his] cell and instead to wait outside [d]efendant Shaw's office in the lobby area of the housing unit.  Defendant Stone appeared in the housing unit. She met with [d]efendants Lewis, Bigelow and Shaw in [d]efendant Shaw's office. [Plaintiff] observed [d]efendant Stone show a major misconduct ticket to [d]efendants Lewis, Bigelow and Shaw. [Plaintiff] observed [d]efendants' Lewis, Bigelow and Shaw each write a major misconduct ticket.  Defendants remained in the office approximately 10 minutes.  Defendants exited the office.  Defendants communicated to [plaintiff] the statements set forth in the complaint at 14(b), © and (d).  Shortly thereafter [plaintiff] was escorted to and placed in segregation ("the hole").

Rsp. Affid. ¶ 13.  *See also* Rsp. Affid. ¶ 15.  Plaintiff claims that, in connection with the issuance of the charges for possession of dangerous contraband, Lewis said "[y]our days of filing grievances here are over[;]" Shaw said, "[s]eems you would learn that grievances cause you nothing but grief[;]" and Bigelow said, "[b]ecause of your grievances, you have no one to blame for your problems but yourself."  Compl. at 4 ¶¶ 14(b)-(d); Rsp. at 4.

That day, plaintiff received four (4) major misconduct reports: (1) at 3:55 p.m., Stone issued plaintiff a major misconduct report for possession of dangerous contraband (030) for use

---

[10]In the February 14, 2001 supplemental declaration, plaintiff refers to Ingham County Circuit Court Judge Peter D. Houk, "who has barred [plaintiff] from filing actions in Michigan State Courts relating to a scandal involving Livingston County Circuit Court Judge Daniel A. Burress, the Judge who presided over [plaintiff's] criminal case."  (Rsp. Ex. 1 at 3-4 ¶ 19).

of masking tape on two envelopes.[11]  The ticket mentions MDOC PD 04.04.120 ("Tool Control").  Lewis assigned plaintiff to segregation pending hearing.  Sgt. Acord reviewed the report the same day, and the hearing was scheduled for January 22, 2001.  Compl. Ex. 4B; (2) at 4:50 p.m., T. Shaw wrote plaintiff a major misconduct for (012) threatening behavior.  Corrections Officer Charles was listed as another employee witness, and Lewis assigned plaintiff to segregation pending hearing.  Sgt. Acord reviewed the report the same day, and the hearing was scheduled for January 22, 2001.  Rsp. Ex. 4; (3) at 6:30 p.m., Lewis issued plaintiff a major misconduct report for possession of dangerous contraband (030) for the presence of masking tape within plaintiff's area of control.  The ticket mentions MDOC PD 04.04.120 ("Tool Control").  Lewis assigned plaintiff to segregation pending hearing.  Sgt. Kennelly reviewed the report the same day, and the hearing was scheduled for January 22, 2001.  Compl. Ex. 5B; and (4) at 7:30 p.m., Bigelow wrote plaintiff a major misconduct report for (036) out of place.  Lewis is listed as another employee witness, and Lewis assigned plaintiff to segregation pending hearing.  Sgt. Kennelly reviewed the report the same day, and the hearing was scheduled for January 22, 2001.  Rsp. Ex. 3.  According to plaintiff, these four (4) tickets were false.  Rsp. Affid. ¶ 14.[12]  On the day the four (4) tickets were issued, plaintiff was again returned to segregation.  (Rsp. Ex. 1 at 4 ¶ 20).

---

[11]When called out, plaintiff allegedly informed defendant Stone that "he had to make his own envelopes because we would not supply them to him."  She asked him where he got the tape, and plaintiff stated "from TV boxes, footlockers and anywhere he could."  She also noted that "Prisoner Scott admitted possessing and using the masking tape on the envelopes submitted to me."  Compl. Ex. 4B (1/19/01 major misconduct ticket issued by Stone).

[12]In his February 14, 2001 supplemental declaration filed in another case, plaintiff stated that each of the four tickets issued on January 19, 2001 were "false and were written in further retaliation against [him] for grievances that [he had] filed against prison staff, including Officer Williams." (Rsp. Ex. 1 at 4 ¶ 20).

11

On January 23, 2001, SRF hearings investigator S. Freed requested that plaintiff's major misconduct tickets for possession of dangerous contraband (030) based on the possession of masking tape be pulled.  In his letters, Freed stated that "[p]er inmate Scott the masking tape was placed on his footlocker and tv box by staff through out the Department to seal and identify his footlockers and tv boxes."  Freed noted that "each footlocker contain[ed] masking tape which was clearly placed there by DOC staff."[13]  He reasoned that "[s]ince staff placed the masking tape on inmate Scott's footlockers and property room staff issued the footlockers to inmate Scott he had staff authorization to possess the masking tape."  Bock approved the requests on January 24, 2001 - without a hearing.  Compl. Ex. 4A, 5A; Rsp. Attach.; Rsp. at 5.  Plaintiff claims he was acquitted of the possession of dangerous contraband tickets "on the basis he committed no rule infractions and the[re] lacked probable cause for issuance of the charges."  Compl. at 6 ¶ 18. At some point, plaintiff's ticket from Bigelow (out of place) was dismissed.  Compl. Ex. 3A.

On or about January 26, 2001, plaintiff wrote to Lewis regarding a January 19, 2001 ticket.  Compl. Ex. 3E.  Additionally, plaintiff wrote two letters to the acting grievance coordinator - one regarding a proposed grievance as to Stone and the other regarding a proposed grievance as to Lewis - regarding January 19, 2001 tickets.  Compl. Exhibits 3A, 3B.  On January 29, 2001, Stone wrote to plaintiff regarding modified access grievance requests.  Some were denied and at least one was granted.  Compl. Exhibits 3C, 3D.  On February 1, 2001, plaintiff wrote to the Warden's Office - specifically mentioning that Stone had not yet responded to his request regarding the proposed grievance against Lewis.  Compl. Ex. 3F.  Plaintiff claims

---

[13]A January 1, 2001 photograph of plaintiff's footlockers is attached to plaintiff's response to defendant's motion.  Rsp. Affid. at 4 ¶ 6; Rsp. Ex. 2.  In his letters, Freed referred to a photo of plaintiff's footlocker.  Compl. Ex. 4A, 5A.

he never received a response from the Warden's Office regarding these grievances.  Plaintiff also claims he brought his grievances to the attention of the MDOC Director, but he did not hear from this office either.  Compl. at 9 ¶ 37.

On February 16, 2001, plaintiff was transferred from SRF to Muskegon Correctional Facility (MCF).  Mtn. Br. at 8 n.1.  On that same date, "[p]laintiff's level was increased and he was transferred to [MCF], a higher security level facility."  Rsp. at 5.  According to plaintiff, MCF is a level III facility.  Rsp. Affid. ¶ 24.

As previously noted, the claims in plaintiff's January 28, 2004 complaint are based upon retaliation and conspiracy.  Compl. at 5, 7.

**2.      The Court should conclude that plaintiff's January 26, 2001 letters attempt exhaustion as to the claims against each of the defendants.**

**a.      42 U.S.C. § 1997e ("Suits by prisoners") generally**

Title 42 of the United States Code governs the public health and welfare.  Section 1997e governs 42 U.S.C. § 1983 suits by prisoners.  This section states in part that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

The Sixth Circuit has held that "the new exhaustion requirement, while not jurisdictional, is mandatory and must be addressed in the first instance by the district court in all prisoner civil rights cases–before the merits of the case are addressed."  *Clark v. Beebe*, No. 98-1430, 1999 WL 993979, **1 (6th Cir. Oct. 21, 1999) (unpublished).  Further, "[t]he exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Plaintiff has the burden to prove that he or she has exhausted his or her administrative remedies. In *Brown v. Toombs*, 139 F.3d 1102 (6th Cir. 1998) (per curiam), the Sixth Circuit held that, under 42 U.S.C. § 1997e(a), "prisoners filing § 1983 cases involving prison conditions must allege and show that they have exhausted all available state administrative remedies. A prisoner should attach to his § 1983 complaint the administrative decision, if available, showing the administrative disposition of his complaint." *Brown*, 139 F.3d at 1103.[14]

The Sixth Circuit has also held that a "prisoner must plead his claims with specificity and show that they have been exhausted by attaching a copy of the applicable administrative dispositions to the complaint or, in the absence of written documentation, describe with specificity the administrative proceeding and its outcome. The reason for the requirement to show with specificity both the claims presented and the fact of exhaustion is so that the district court may intelligently decide if the issues raised can be decided on the merits." *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000) (citing *Brown*).

With regard to the dismissal of prisoner lawsuits, 42 U.S.C. § 1997e(c) provides:

(1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other

_____

[14]The Sixth Circuit appears to be alone in placing the burden on plaintiffs to show exhaustion. The other circuit courts that have considered the question characterize lack of exhaustion as an affirmative defense. *See Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999); *Jenkins v. Haubert*, 179 F.3d 19, 29 (2d Cir. 1999); *Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir. 1998). Thus, in those circuits the defendant bears the burden of establishing that the claims are not exhausted, *see Massey*, 196 F.3d at 735, and the defense is subject to waiver and forfeiture, *see Perez v. Wisconsin Dep't of Corrections*, 182 F.3d 532, 536 (7th Cir. 1999); *Wendell*, 162 F.3d at 890.

Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

(2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

42 U.S.C. § 1997e(c)(1)-(2).  In addition, "federal courts should not adjudicate any such claim until after exhaustion unless the complaint satisfies § 1997e(c)(2)."  *Brown*, 139 F.3d at 1104. "District courts should enforce the exhaustion requirement sua sponte if not raised by the defendant."  *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998).

**b.     Plaintiff's grievances**

It is clear that plaintiff has filed grievances during his incarceration.  As listed in defendant Stone's October 11, 2000 memorandum, plaintiff's grievances include: (1) SRF-00-07-00895-28z; (2)  SRF-00-09-01051-14z; (3) SRF-00-09-01052-14z; (4) SRF-00-09-01053-17a; (5) SRF-00-09-01060-14z; (6) SRF-00-09-01082-28a; (7) SRF-00-10-01134-28z; and (8) SRF-00-10-01166-28b.  Based upon the grievance numbers, these grievances were filed from July 2000 through October 2000 - in advance of his January 19, 2001 major misconduct reports. Therefore, they could not possibly have grieved the retaliation claim plaintiff asserts based upon the issuance of the January 19, 2001 major misconduct reports.

Plaintiff claims that he has exhausted his available administrative remedies regarding the claims within the instant complaint.  Form Compl. at 3, Compl. at 8 ¶ 34.  However, complicating the issue of whether plaintiff has exhausted his administrative grievances in the instant case is the fact that he was placed on modified access status at the time of the allegedly

retaliatory act - the issuance of the January 19, 2001 major misconduct reports.  Therefore, the Court should consider whether plaintiff attempted to participate in the grievance process with regard to the claims at bar.

Plaintiff claims that his January 26, 2001 letter(s) to the grievance coordinator "proposed grievances regarding events giving rise to this action[.]"  Compl. at 9 ¶ 37.  As previously noted, plaintiff's January 26, 2001 letters to the acting grievance coordinator concerned a proposed grievance as to Stone and a proposed grievance as to Lewis regarding January 19, 2001 tickets. Compl. Exhibits 3A, 3B.  Although these letters do not expressly propose grievances as to Bigelow and Shaw, the letters allege that plaintiff also received tickets from Bigelow and Shaw on January 19, 2001.  Compl. Ex. 3B.

The January 29, 2001 response from Stone denies plaintiff's request to file a grievance against her for writing the misconduct for Possession of Dangerous Contraband (030).[15] However, the letter does not mention a proposed grievance as to Lewis.  Compl. Ex. 3C, 3D. This is consistent with plaintiff's representation in his February 1, 2001, letter to the Warden's Office that Stone had not yet responded to his request regarding the proposed grievance against Lewis.  Compl. Ex. 3F.  On the other hand, defendant Stone states that she "responded in a timely manner to all of prisoner Scott's request for grievance forms[,]" and her responses complied with MDOC PD 03.02.130.  Stone Affid. at 3 ¶ 13.

---

[15]There are twelve (12) handwritten numbers in the left margin of this letter.  Compl. Exhibits 3C, 3D.  According to Stone, these "refer to the number of grievance requests [plaintiff] made *while on modified access*."  Stone Affid. ¶ 13.

However, plaintiff maintains that he "placed those numbers on the memo as part of an indexing system for [his] own files and they have no relation to the amount of proposed grievances [he] submitted."  Rsp. Affid. ¶ 19.  He claims to have submitted 123 total proposed grievances while at SRF.  Rsp. Affid. ¶ 19.

16

c.      **Analysis**

MDOC's grievance policy provides that:

> While on modified access, the prisoner or parolee shall be able to obtain
> grievance forms only through the Step I Grievance Coordinator.  A grievance
> form shall be provided if the Step I Grievance Coordinator determines that the
> issue the prisoner or parolee wishes to grieve is grievable and otherwise meets the
> criteria outlined in this policy.  The Grievance Coordinator shall maintain a
> record of requests received for grievance forms and whether the request was
> approved or denied and, if denied, the reason for the denial.  If a prisoner or
> parolee on modified access attempts to file a grievance using a form not provided
> by the Grievance Coordinator, the prisoner or parolee shall be notified that the
> grievance will not be processed. . . .

MDOC PD 03.02.130, ¶ MM (effective 12/29/03).

"[M]odified access does not deny a Michigan prisoner the right or ability to seek redress

for meritorious grievances. Rather, it merely requires the prisoner to obtain permission from the

grievance coordinator to file a grievance." *Kennedy v. Tallio*, 20 Fed.Appx. 469, 470 (6th Cir.

2001).  *See also Williams v. Moore*, 34 Fed.Appx. 475, 477 (6th Cir. 2002) ("[Plaintiff] did not

allege or demonstrate that he followed MDOC procedure for obtaining grievance forms while on

modified access. [Plaintiff] claims that he was not allowed to file grievance forms, but the record

shows the grievance coordinator told [plaintiff] that he must follow the procedures and try orally

to resolve the claims before he would get grievance forms and that Williams failed to do this.").

"[A] prisoner on modified access must make an attempt to obtain a grievance form from

the Step I coordinator."  *Sarah v. Heidtman*, 97 Fed.Appx. 550, 552 (6th Cir. 2004) (referencing

Mich. Dep't of Corr., Policy Directive 03.02.130, ¶ MM. (effective Nov. 1, 2000)).  "[I]f a

grievance officer dismissed a non-frivolous complaint by [plaintiff], that would be the end of

possible administrative remedies with regard to that grievance, and a court would thus have

jurisdiction to hear a related federal claim, since all possible administrative remedies would have

been attempted." *Walker v. Michigan Dept. of Corrections*, 128 Fed.Appx. 441, 446 (6th Cir.

2005). "If a prisoner has been placed on modified access to the grievance procedure and

attempts to file a grievance which is deemed to be non-meritorious, he has exhausted his

'available' administrative remedies as required by § 1997e(a)." *Kennedy v. Tallio*, 20 Fed.Appx.

469, 470 (6th Cir. 2001).

"Consequently, [Plaintiff]'s placement on modified access cannot prevent him from filing

claims in federal court." *Kennedy*, 20 Fed.Appx. at 470-471. "Placement on modified access

[does] not deprive [plaintiff] of the ability to file civil rights actions in federal court. [Plaintiff]'s

placement on modified access to the grievance procedure merely enable[s] prison officials to

screen [plaintiff]'s grievances prior to filing to determine whether they [are] grievable,

non-frivolous, and non-duplicative." *Kennedy*, 20 Fed.Appx. at 471 (referencing Mich. Dep't of

Corr. Policy Directive 03.02.130(II)(PP)).

Considering these cases regarding exhaustion of administrative remedies under modified

access status, as well as the exhaustion law for the Sixth Circuit, the Court should conclude that

plaintiff's January 26, 2001 letters attempt exhaustion as to the claims against each of the

defendants. One letter specifically proposes a grievance against defendant Stone and the other

specifically proposes a grievance against defendant Lewis. The letters each mention the four

January 19, 2001 grievances and identify the four defendants as writers/issuers of the tickers.

Compl. Exhibits 3A, 3B. Finally, one letter states: "these tickets were the result of a concerted

effort on the part of these individuals and were orchestrated by Ms. Stone. Ms. Stone had no

legitimate reason to orchestrate the issuance of these tickets which appear retaliatory." Compl.

Ex. 3A. The other letter states: "these tickets were the result of a concerted effort on the part of

18

these individuals and [were] o[r]chestrated by Ms. Stone.  There was no legitimate reason for the issuance of these tickets which were retaliatory."  Compl. Ex. 3B.

Furthermore, defendant Stone's January 29, 2001 letter denies plaintiff's request to file a grievance against Stone, concluding that "the misconduct was issued in accordance with PD 03.02.130 Prisoner Discipline."  Compl. Ex. 3D.  There is no indication that the grievance form was denied for failure to follow the modified access directions to request a grievance form. Additionally, while defendant Stone's January 29, 2001 letter does not address plaintiff's request to file a grievance against defendant Lewis, plaintiff's January 26, 2001 letter to defendant Lewis informs him that plaintiff is considering filing a grievance against defendant Lewis, Compl. Ex. 3E, further supporting the conclusion that it was not a procedural failure on plaintiff's part to acquire a grievance form against defendant Lewis.

**3.    Plaintiff has produced evidence that defendant Bigelow was personally involved in the events underlying his complaint.**

**a.    Parties' arguments**

Defendants argue that defendant Bigelow "had nothing to do with the misconduct tickets issued on January 19, 2001.  Thus, she had no personal involvement and has no liability under Section 1983."  Mtn. Br. at 4-6.  Defendants contend that not only do all four defendants deny striking an agreement to issue the charges written by Stone and Lewis, but also "there is nothing on the misconduct charge documents themselves that would indicate that Bigelow had anything to do with the misconduct charges."  Mtn. Br. at 4-5.  Defendants claim that plaintiff's statement that they conspired to issue the charges is speculative and not supported by evidence, and they contend that "[p]laintiff's conclusory allegations are insufficient to state a claim upon which relief can be granted."  Mtn. Br. at 5.  Defendants argue that "[t]he fact that the defendants may

19

work together is not sufficient to sustain a claim that [d]efendant Bigelow was personally

involved with these two misconducts."  Mtn. Br. at 5.  Defendants contend that "[t]here is

nothing in this case that would lend credence to [p]laintiff's claim that defendant Bigelow had

anything to do with the two January 19, 2001 misconduct tickets."  Mtn. Br. at 6.

**b.       Personal involvement generally**

Liability in a § 1983 action cannot be based on a theory of *respondeat superior.  See*

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).  "[T]he

mere right to control without any control or direction having been exercised and without any

failure to supervise is not enough to support § 1983 liability."  *Monell v. Department of Soc.*

*Servs.*, 436 U.S. 658, 694 n.58 (1978), citing *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976).

As the Sixth Circuit has stated:

"Section 1983 liability will not be imposed solely upon the basis of respondeat
superior.  There must be a showing that the supervisor encouraged the specific
incident of misconduct or in some other way directly participated in it.  *At a
minimum, a § 1983 plaintiff must show that a supervisory official at least
implicitly authorized, approved or knowingly acquiesced in the unconstitutional
conduct of the offending subordinate.*"

*Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v.*

*Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (emphasis added)) (emphasis by *Taylor* court); *see*

*also*, *Monell*, 436 U.S. at 693-95; *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989); *Dunn v.*

*Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

Furthermore, an allegation that a supervisor was aware of an actionable wrong committed

by a subordinate and failed to take corrective action "is insufficient to impose liability on

supervisory personnel under § 1983."  *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).  As the

*Haydon* court stated: "A supervisory official's failure to control, or train the offending individual

is not actionable, unless the supervisor 'either encouraged the specific incident or in some other way directly participated in it.'" *Haydon*, 853 F.2d at 429 (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).

**c.     Analysis**

Bigelow states that she does not "recall personally writing *any* major misconduct on prisoner Scott, as he alleges in his letters requesting grievance forms[.]" Bigelow Aff. ¶ 7. However, as mentioned earlier, at 7:30 p.m. on January 19, 2001, Bigelow wrote plaintiff a major misconduct report for (036) out of place.  Lewis is listed as another employee witness, and Lewis assigned plaintiff to segregation pending hearing.  Sgt. Kennelly reviewed the report the same day, and the hearing was scheduled for January 22, 2001.  Rsp. Ex. 3.  *See also* Rsp. Affid. ¶ 27.[16]

Defendants argue that "[i]t is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings."  *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986) (citing *Place v. Shepherd*, 446 F.2d 1239 (6th Cir.1971)).  They further argue that "the allegations must be more than mere conclusions, or they will not be sufficient to state a civil rights claim."  *Ana Leon T. v. Federal Reserve Bank of Chicago*, 823 F.2d 928, 930 (6th Cir. 1987) (citing *Place v. Shepherd*, 446 F.2d 1239, 1244 (6th Cir.1971)).  Mtn. at 5.

---

[16]In response to ¶ 7 of Bigelow's affidavit, plaintiff notes that defendant Bigelow wrote him the ticket January 19, 2001 ticket for out of place (036).  Rsp. Affid. ¶ 27.

21

However, plaintiff has produced an exhibit evidencing defendant Bigelow's issuance of a major misconduct ticket for (036) out of place, Rsp. Ex. 3, and plaintiff's affidavit in support of his response implicates defendant Bigelow in the alleged conspiracy, Rsp. Affid. ¶ 13. Therefore, plaintiff has produced evidence that defendant Bigelow was personally involved in the events underlying plaintiff's complaint.

**4.  Plaintiff's First Amendment retaliation claim survives summary judgment.**

**a.  Plaintiff's claim**

Plaintiff claims that, on the basis of defendants' statements set forth above and other similar statements, "[d]efendants, among other things, meant and were taken to mean that said charges [for possession of dangerous contraband] were issued in further[a]nce of a concerted effort on the part of [d]efendants in reaction to [p]laintiff's utilization of the grievance process and to increase his security level to prompt his transfer to a higher security level facility." Compl. at 4 ¶ 15.  Plaintiff claims that defendants Stone and Lewis knew their accusations to be false and that they, aided by defendants Shaw and Bigelow, "conjured-up said allegations and charges maliciously and purposefully with the explicit intent to injure [p]laintiff in that such charges put [p]laintiff in danger of further (1) loss of liberty through loss of good time credit; (2) dimin[i]shing his chances for parole; and (3) increasing his security level."  Compl. at 5 ¶ 16. According to plaintiff, "[d]efendants lacked any probable cause whatsoever to believe [p]laintiff guilty of any offense, and particularly the offenses of possession of dangerous contraband, which did not occur but were fabricated by [d]efendants solely to injure [p]laintiff, penalize him for utilizing the institution's grievance process, and to stifle further such activities on the part of [p]laintiff."  Compl. at 5 ¶ 17.

22

Plaintiff brings a First Amendment retaliation claim.  Compl. at 5-7 ¶¶ 19-26.  Plaintiff contends that he "exercised his First Amendment rights by utilizing the institution's grievance process including filing grievances against the [d]efendants and other prison personnel."  Compl. at 6 ¶ 22.  Plaintiff claims that "[d]efendants filed, caused to be filed, and aided in the filing of false major misconduct charges because plaintiff filed grievances in exercise of his First Amendment rights to petition the government for redress."  Compl. at 6 ¶ 23.  According to plaintiff, defendants "knowingly, intentionally, corruptly and with utter disregard for [p]laintiff's constitutional rights filed and caused to be filed major misconduct charges in an attempt to 'frame' plaintiff."  Compl. at 6 ¶ 24.  Plaintiff claims that defendants "attempted to deprive [him] of his constitutional right to petition the government for redress, retaliated against him for exercising that right and took an adverse action against him."  Compl. at 7 ¶ 25.  Plaintiff claims that defendants' illegal, wrongful, and tortious acts resulted in plaintiff suffering damages including "fear, anxiety, interference with his exercise of constitutional rights and a significant risk of punishment, loss of privileges and additional loss of liberty."  Compl. at 7 ¶ 26.

**b.      First Amendment retaliation**

As set forth in *Thaddeus-X*, the elements of a retaliation claim under the First Amendment standard are "...(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two--that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d at 394, citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 406 (6th Cir.1998); *Penny v. United Parcel*

23

*Serv.*, 128 F.3d 408, 417 (6th Cir.1997); and *Yellow Freight Sys., Inc. v. Reich*, 27 F.3d 1133, 1138 (6th Cir.1994).

**c.      Use of the grievance process is protected conduct.**

"It is well established that prisoners have a constitutional right of access to the courts." *Thaddeus-X*, 175 F.3d at 391.  However, this right is not unlimited.  *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 355 (1996)) ("The tools [*Bounds v. Smith*, 430 U.S. 817 (1977)] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.").  "[A] prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only."  *Id*.

"[T]he First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures."  *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994), citing *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir.1989).  *See also Rhodes v. Alameda County Sheriff's Department*, NO. C95-3346-MJJ, 1999 WL 551193, *3 (N.D.Cal. July 19, 1999), citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir.1995) ("The right to file a grievance is subsumed under the First Amendment right to petition the government for redress of grievances and protects both the filing and content of prison grievances.").

However, germane to a conclusion that plaintiff was engaged in protected conduct is the issue of whether plaintiff's grievances were frivolous.  "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."  *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).  "This right is protected, however, only if the

24

grievances are not frivolous." *Herron*, 203 F.3d at 415. *See also Scott v. Kilchermann*, No. 99-1711, 2000 WL 1434456, **2 (6th Cir. Sept. 18, 2000) (referencing *Herron*, 203 F.3d at 415).[17]

While plaintiff has not provided the Court with grievance forms, there is evidence that he engaged in the protected conduct of filing grievances. Specifically, defendant Stone's October 11, 2000 letter mentions eight (8) grievances. Four (4) were determined to be without merit: (1) SRF-00-09-01051-14z; (2) SRF-00-09-01052-14z; (3) SRF-00-09-01053-17a and (4) SRF-00-09-01060-14z. The other four were rejected. Compl. Ex. 1. Beyond these descriptions, defendant Stone's letter does not state that any of these grievances were frivolous. Furthermore, the letter does not detail why the other four grievances were rejected. Therefore, the Court should conclude that plaintiff engaged in protected conduct (filing grievances) before the alleged retaliatory action(s).[18]

Obviously, plaintiff's placement on modified access status is evidence that plaintiff has abused the grievance process. Yet, defendants do not argue that plaintiff was not engaged in protected conduct. Furthermore, defendants do not argue that plaintiff has exercised his right to

---

[17]In *Herron*, the Court noted that plaintiff's "pursuit of legal claims against CCCF officials in the instant case and in previous cases was protected conduct only to the extent that the underlying claims had merit." *Herron*, 203 F.3d at 415.

[18]Also, as previously mentioned, plaintiff submitted proposed grievances against Stone and Lewis on or about January 26, 2001. Compl. Ex. 3A, 3B. Defendant Stone's January 29, 2001 letter, specifically addresses several proposed grievances against RUO Williams (one denied as non-grievable), two proposed grievances against RUM Rosek (one denied as non-grievable the other denied as duplicative), and one proposed grievance against defendant Stone (request denied), as well as a proposed grievance to appeal the disposition of plaintiff's January 11, 2000 administrative hearing (request granted). Compl. Ex. 3C, 3D.

The proposed grievances against defendant Stone and Lewis (January 26, 2001) post-date the major misconduct tickets they wrote (January 19, 2001). While the January 29, 2001 denial of plaintiff's proposed grievance as to Stone is relevant to the issue of whether plaintiff has exhausted his administrative remedies, it would not be illustrative of the alleged protective conduct upon which plaintiff's claim of retaliation is based.

file grievances "in a manner that violates legitimate prison regulations or penological objectives." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Primarily, defendants' First Amendment retaliation argument concentrates on an alleged lack of a causal connection between alleged protected conduct and alleged adverse action(s). *See* Mtn. Br. at 7-9.

**d.    Issuance of a major misconduct ticket, threats, and assignment to segregation are adverse actions.**

"[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Adopting this test from the Seventh Circuit's decision in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), the Sixth Circuit explained that this requirement "is intended to weed out only inconsequential actions." *Thaddeus-X*, 175 F.3d at 398. "'[S]ince there is no justification for harassing people for exercising their constitutional rights [the effect on freedom of speech] need not be great in order to be actionable.'" *Id.* at 397 (quoting *Bart*, 677 F.2d at 625) (alteration in original). Thus, "[t]he threat of even a minor deprivation of some valued good can deter the exercise of protected rights." *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993); *see also, Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994) ("[E]ven minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures."). Finally, under this test the issue of whether a defendant's action is the type of conduct that would deter a person of ordinary firmness from engaging in protected conduct is generally a question of fact for the jury. *See Thaddeus-X*, 175 F.3d at 397-98 (discussing cases); *Bart*, 677 F.2d at 625.

**i.    Issuance of a major misconduct ticket is an adverse action.** It may be true, as defendant Lewis states, that "[p]risoners are allowed to file grievances at any time. The writing

26

of a major misconduct does not take away a prisoner's right to grieve issues surrounding his incarceration." Lewis Affid. at 2 ¶ 11. It may also be true, as defendant Shaw states, that plaintiff "did not suffer any sanctions or lose any good time or disciplinary credits as a result of the misconducts written by Ms. Stone or RUO Lewis[,]" and that plaintiff's "security level was not increased as a result of these tickets; he was a Level II prisoner at the time of the incident and remained at Level II when he left SRF." Shaw Affid. ¶¶ 13,14.

However, in *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002), the Sixth Circuit noted that the issuance of a major misconduct ticket subjects the recipient "to the risk of significant sanctions." The Court held that "[a] reasonable jury could conclude that being subjected to the . . . risk of such severe sanctions for raising a legitimate complaint 'would deter a person of ordinary firmness from continuing to engage in that [protected] conduct.'" *Brown*, 312 F.3d at 789 (citing *Thaddeus-X*, 175 F.3d at 394). Therefore, the issuance of a major misconduct is an adverse action. *But see Jackson v. Hamlin*, No. 02-2040, 2003 WL 1194246, **2 (6th Cir. Mar. 11, 2003) (Martin, C. J.; Rogers, C. J.; and Edmunds, D. J.) (unpublished) ("Furthermore, as the misconduct tickets were dismissed, Jackson ultimately did not suffer any adverse action because of them.").

Furthermore, plaintiff has alleged that each of the four defendants made a statement to him regarding grievances, some of which might be characterized as threatening statements. Compl. ¶ 14. Although, Stone, Lewis, and Bigelow specifically deny making these statements (Stone Affid. ¶ 8, Lewis Affid. ¶ 11, Bigelow Affid. ¶ 8), plaintiff has submitted a verified complaint with regard to his allegations. Additionally, as previously mentioned, on each of the January 19, 2001 misconduct tickets, defendant Lewis assigned plaintiff to segregation pending

27

hearing.  Compl. Exhibits 4B, 5B; Rsp. Exhibits 3, 4.  According to a declaration plaintiff filed

in another case, on the day the four (4) tickets were issued he was again returned to segregation.

(Rsp. Ex. 1 at 4 ¶ 20).  Therefore, the Court should consider whether these comments and/or

threats and/or the assignment to segregation pending hearing constitute "adverse actions".

**ii.     Certain threats and assignment to segregation may be considered adverse actions**

**for purposes of First Amendment retaliation analysis.**  In *Thaddeus-X* the Sixth Circuit

stated:  "Harassment, physical threats, and transfer to the area of the prison used to house

mentally disturbed inmates, especially combined with the conditions allegedly present there,

would likely have a strong deterrent effect." *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir.

1999).  The Sixth Circuit later stated:  "'We emphasize that while certain threats or deprivations

are so de minimis that they do not rise to the level of being constitutional violations, this

threshold is intended to weed out only inconsequential actions, and is not a means whereby

solely egregious retaliatory acts are allowed to proceed past summary judgment.'"  *Bell v.*

*Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (citing *Thaddeus-X*, 175 F.3d at 398).  *See also Dean*

*v. Conley*, No. 98-5906, 1999 WL 1045166, **2 (6th Cir. Nov. 9, 1999) (internal citations

omitted) ("Although certain threats or deprivations are so minor that they do not rise to the level

of being constitutional violations, solely egregious retaliatory acts alone may be sufficient to

defeat a motion for summary judgment, and Dean's placement in segregation is considered a

sufficiently adverse action.").

Since *Thaddeus-X*, the Sixth Circuit has commented on the viability of threats and

transfer to segregation as adverse actions in the context of a retaliation claim.  *See Scott v.*

*Churchill*, 377 F.3d 565, 571-572 (6th Cir. 2004) ("*Cale [v. Johnson*, 861 F.2d 943 (6th Cir.

1988)[19]], decided in 1988, clearly establishes that the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation."); *Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir. 2003) ("Although we affirm the dismissal of this claim, it is not because threats are never actionable, but the underlying conduct (a transfer) does not constitute adverse action."); *Reynolds v. Green*, 25 Fed.Appx. 256, 261 (6th Cir. 2001) ("We have held that the public release of details about a plaintiff's rape, the '[h]arrassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates' of a prisoner, and a plaintiff's removal from a tow-call list, all constituted adverse actions that would deter a person of ordinary firmness from engaging in constitutionally protected conduct.") (internal citations omitted); *Mulazim v. Corrigan*, 7 Fed.Appx. 427, 431 (6th Cir. 2001) ("Unlike the plaintiff's allegations in *Thaddeus-X*, Mulazim does not allege that he was harassed, physically threatened, transferred to an area at which he would suffer unhealthy living conditions, or that he was transferred to administrative segregation.") (internal citations omitted).

In a February 14, 2001 supplemental declaration filed on March 8, 2001 in Case No. 95-00571, *Scott v. Churchill*, Western District of Michigan, plaintiff stated that he was found guilty of the threatening behavior ticket (the ticket written by defendant Shaw) and had been given another 30 days detention sanction.  (Rsp. Ex. 1 at 4 ¶ 20).  In response to ¶ 14 of Shaw's affidavit, plaintiff states: "As a result of the [tickets] issued against [him], [his] security level was raised and [he] was transferred from SRF to [MCF] on February 16, 2001, a level III

---

[19]"To the extent that our prior decisions have imposed the 'shocks the conscience' test when prisoners claim retaliation in violation of an enumerated constitutional right, they are in conflict with the Supreme Court's decisions in *Graham* [*v. Connor*, 490 U.S. 386 (1989)] and its progeny and are no longer the law of this Circuit."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999).

facility." Rsp. Affid. ¶ 24. Considering the foregoing case law, in addition to the issuance of a major misconduct ticket, certain threats allegedly made by defendants and plaintiff's assignment to segregation pending hearing may be considered adverse actions.

**e.    The timing of plaintiff's misconduct tickets raises a question of material fact regarding a causal connection between the protected conduct and the adverse action.**

i.    When proving "a causal connection between the protected conduct and the adverse action[,]" "the subjective motivation of the defendants is at issue." *Thaddeus-X*, 175 F.3d at 399. "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Id*. at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "If the defendant can show that he would have taken the same action in the absence of the protected activity he is entitled to prevail on summary judgment." *Id*.

However, "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper." *American Civil Liberties Union of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274 (1977)).

ii.    Defendants argue that "[p]laintiff has not sustained his burden of showing a causal connection between his First Amendment activities and the two major misconduct tickets he received on January 19, 2001[;] thus his retaliation claims fail." Mtn. Br. at 7-9. Defendants contend that plaintiff "has not alleged or provided any evidence to show that he specifically filed grievances or lawsuits against any of the defendants prior to the two major misconduct tickets at

issue here." Mtn. Br. at 7. Defendants claim the tickets were not false but, rather, were based upon MDOC PD 04.04.120's prohibition of possession of masking tape by security Level II prisoners, the presence of masking tape on envelopes plaintiff sent to defendant Stone, and defendant Lewis' discovery of masking tape on personal property in plaintiff's living unit. Mtn. Br. at 8. Allegedly, "[p]laintiff knew he had masking tape, and admitted using it." According to defendants, the hearing investigator "[giving] [p]laintiff a break" and causing the tickets to be pulled does not mean they were false. Defendants maintain that the tickets could not have been false, because plaintiff admitted having the masking tape. Mtn. Br. at 8.

Furthermore, they allege, plaintiff's allegations of retaliation are conclusory, as "[p]laintiff has not offered any facts to support a connection between his prior grievance filings and lawsuits and these two tickets." Mtn. Br. at 8. Defendants maintain that plaintiff's complaint only alleges retaliation, which "does not raise a genuine issue of fact necessitating trial." Mtn. Br. at 8 (citing *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). According to defendants, plaintiff's retaliation claims must fail, as defendants Stone and Lewis issued the tickets, "because they personally observed [p]laintiff with masking tape, which is a 'dangerous tool' under MDOC policy." Mtn. Br. at 8-9. Defendants claim that, based upon *Thaddeus-X*, 175 F.3d at 399, they are entitled to summary judgment, because they "have established that they wrote the tickets after [p]laintiff violated MDOC policy[.]" Mtn. Br. at 9.

Plaintiff argues that he "has stated a viable retaliation claim." Rsp. at 6-12. Plaintiff maintains that "[d]efendants were fully aware at the time the tickets were issued that the tape had been placed on [his] property by prison staff. This was explained to [d]efendant Stone at the time she called [p]laintiff to her office on January 19, 2001." Rsp. at 7 (referencing Rsp. Affid. ¶

31

12).  He also claims that defendant Shaw "became aware of the tape upon personally examining [p]laintiff's property when he first arrived in the housing unit in September 2000."  Rsp. at 7 (referencing Rsp. Affid. ¶ 7).  He further claims that defendants Lewis and Bigelow "were aware of this fact through shake downs of [p]laintiff's property routinely conducted beginning upon [his] arriv[al] in the housing unit and continuing up to the time the tickets were issued."  Rsp. at 7-8 (referencing Rsp. Affid. ¶ 8).  Additionally, plaintiff notes Hearing Investigator Freed's notation that "each footlocker contains masking tape which was clearly placed there by DOC staff."  Rsp. at 8; Compl. Ex. 4A.  Plaintiff notes that "for [d]efendants to suggest that masking tape placed on [his] <u>NINE</u> (9) footlockers by prison staff somehow escaped their attention and remained a secret until January 19, 2001 is just plan [a]bsurd."  He maintains that defendants "were completely famil[i]ar with [his] property as they were with the property of all other prisoners in that housing unit."  Rsp. at 8.

Furthermore, plaintiff argues, "[o]nce [he] mailed the envelopes with tape on them to [d]efendant Stone, [he] no longer possessed the tape that [d]efendant Stone accused [him] of possessing."  Rsp. at 8-9.  According to plaintiff, "[a]ny contraband status of the tape immediately ceased to exist upon plaintiff relinquishing possession of the tape by mailing the envelopes to Stone."  Rsp. at 9.

Plaintiff contends that "[t]he prison rule regarding tape is applied to prohibit prisoners from possessing rolls of tape[;]" "[t]he usage of tape in a prison setting is as common as it is any place else[;]" and "[i]t would be difficult, if not impossible, to find even one prisoner without tape affixed to something in [his/her] possession."  Plaintiff argues that "[d]efendants singled [him] out and issued unfounded tickets against him."  Rsp. at 9.

32

Plaintiff claims that "[t]he tickets were false because the body of the tickets omitted the known fact that the tape was provided to [him] by prison staff." Therefore, "the tickets were nothing more than a pretext to retaliate against [him] for his grievance and litigation activities." Rsp. at 9-10. He argues that "[b]ut for plaintiff exercising protected rights, the tickets in question would never have been written." Rsp. at 10. Plaintiff construes the alleged comments by defendants set forth at ¶ 14 of his complaint as defendants' verbal comments that "the tickets were issued in retaliation for his usage of the grievance process." He also claims that his pleadings show "he was [the] target of an on-going pattern of abuse to obstruct his grievance and litigation activities." Plaintiff contends that "[b]ecause the tickets were knowingly false, [p]laintiff has established a clear link between the issuance of the tickets and his exercise of protected rights." Rsp. at 12.

iii.     For the most part, defendants maintain that the misconduct tickets were not issued on a retaliatory basis. Mtn. Br. at 8-9. MDOC PD 03.03.105, "Prisoner Discipline", provides that "[a] Major Misconduct Report shall be written if the behavior constitutes a nonbondable major misconduct, as identified on Attachment B." MDOC PD 03.03.105 ("Prisoner Discipline"), effective 02/14/05, ¶ J. The nonbondable charge of "Possession of Dangerous Contraband" includes "possession of critical tools and materials or dangerous tools and materials as defined by policy[.]" *Id*. at Attach. B (030). *See also* Mtn. Exhibits E, E-1 (MDOC PD 03.03.105, effective 01/01/99). MDOC PD 04.04.120, "Tool Control", provides that dangerous tools include "[m]asking, adhesive and fiberglass tape when used by prisoners who are confined at security Level II or above." Mtn. Ex. F (MDOC PD 04.04.120, effective 12/21/98, Attach. B ¶ 15).

Each of the defendants has supplied an affidavit in support of the collective motion for summary judgment.  Defendant Stone denies writing "the January 19, 2001 major misconduct in retaliation for prisoner Scott's use of the grievance procedure or for any other exercise of his First Amendment rights."  (Doc. Ent. 20 Stone Affid. at 1 ¶ 5).  She maintains that "[t]he basis for the major misconduct was true and accurate, it was not written in retaliation for anything." Stone Affid. ¶ 9.  Defendant Stone issued the major misconduct in accordance with MDOC PD 03.03.105 ("Prisoner Discipline") and MDOC PD 04.04.120 ("Tool Control"), and she "issued this major misconduct because [p]risoner Scott was not permitted to possess masking tape, and he admitted he got it from TV boxes, footlockers, or anywhere he could[,]" and he admitted "possessing the masking tape[.]"  *Id*. at 1-2 ¶¶ 6-7, 9.  Defendant Stone also denies the comment at paragraph 14(a) of the complaint that she allegedly made.  *Id*. at 2 ¶ 8.  Stone claims that the Warden pulled plaintiff's major misconduct ticket "based on information received by Hearings Investigator Freed, after the misconduct was written and had been reviewed with prisoner Scott as required by policy."  This information "included Prisoner Scott admitting he possessed the Dangerous Contraband (the masking tape), but that it was 'given' to him by staff by their placing it on his property (footlockers and TV boxes)."  *Id*. at 2 ¶ 10.  According to defendant Stone, the December 26, 2000 extension of plaintiff's modified access status was made in accordance with MDOC PD 03.02.130.  Allegedly, plaintiff "had 45 grievance requests in violation of [policy]. His modified access could have been extended 30 days for each violation. [Defendant Stone's] recommendation to the Warden was for his modified access to be extended for six months as opposed to 30 days for each of the 45 violations."  Stone Affid. at 3 ¶ 12.

34

Defendant Shaw claims that, on January 19, 2001, defendant Stone "relayed information to [Shaw] that prisoner Scott delivered to [Stone] grievances contained in two envelopes . . . that were sealed with several inches of masking tape." (Doc. Ent. 20 Shaw Affid. ¶ 4). Defendant Stone called defendant Shaw's office and requested that plaintiff "be shaken down because he was in possession of masking tape." Shaw Affid. ¶ 5. Defendant Shaw claims that she was appropriately contacted by defendant Stone based upon MDOC PD 04.04.120. Shaw Affid. ¶ 6. Defendant Shaw "assigned RUO Lewis to shake down prisoner Scott's cell [27/28] to look for masking tape." Shaw Affid. ¶ 7. Upon finding the dangerous contraband (masking tape) within plaintiff's area of control, defendant Lewis "was required to write the misconduct for Possession of Dangerous Contraband, because that offense is a 'non-bondable' major misconduct." Shaw Affid. ¶ 9. According to Shaw, plaintiff "did not provide staff with any legitimate reason for possessing the contraband masking tape." Shaw Affid. ¶ 11. Furthermore, "Warden Bock subsequently 'pulled' the misconduct tickets, at the request of and based upon information learned from the Hearing Investigator." Shaw Affid. ¶ 12. Shaw claims that the possession of dangerous contraband tickets were not 'false' and "were not issued in retaliation for prisoner Scott's grievance activities or because he files lawsuits." Shaw Affid. ¶¶ 15, 16.

Defendant Lewis claims that, on January 19, 2001, "the Unit received a phone call requesting that we shake down (search) prisoner Scott's cell." (Doc. Ent. 20 Lewis Affid. ¶ 3). Lewis performed the shake down and specifically looked for masking tape. Lewis Affid. ¶ 4. Defendant Lewis found "masking tape holding a cable cord to the wall above Desk 28, also masking tape was attaching the curtain to the back wall . . . masking tape was also holding a bag to the wall behind the door." These items were found in plaintiff's area of control. Compl. Ex.

35

5B.  "Prisoner Scott had masking tape in his cell, so [defendant Lewis] wrote a major misconduct report charging [plaintiff] with Possession Dangerous Contraband."  Lewis Affid. ¶ 5.  Defendant Lewis notes that there was "no intent to retaliate against prisoner Scott for any reason[,]" and "[t]he writing of the misconduct was not related to any grievances filed by prisoner Scott."  Lewis Affid. ¶ 6.  He also notes that "[p]risoner Scott's cell was searched, he was in possession of dangerous contraband, and a major misconduct report was appropriately written."  Lewis. Affid. ¶ 8.  According to Lewis, it was his responsibility "to write the misconduct report. [It] was not conjured up, or in any way an attempt to harm prisoner Scott. The report was a statement of fact based on his possession of the contraband."  Lewis Affid. ¶ 9. It was not Lewis' role to determine plaintiff's guilt or innocence.  It was Lewis' responsibility to factually report what he found in plaintiff's cell.  Lewis Affid. ¶ 10.  Lewis also denies making the statement set forth at ¶ 14(b) of plaintiff's complaint.  Lewis Affid. ¶ 11.

Defendant Bigelow claims that she "did not cause major misconduct charges to be filed against prisoner Scott."  Bigelow Affid. ¶ 5.  She further states that she "was not involved with the writing of the Dangerous Contraband tickets on prisoner Scott by Officer Lewis or Ms. Stone[,]" and notes that she "was not even listed as a witness on either ticket."  Bigelow Affid. ¶ 6.  She further denies making the statement alleged at ¶ 14(d) of plaintiff's complaint.  Bigelow Affid. ¶ 8.[20]  It is Bigelow's position that she "committed no illegal or wrongful acts against prisoner Scott, nor did [she] in any way attempt to deprive him of his constitutional rights."  Bigelow Affid. ¶ 9.

---

[20]Bigelow admits that she has "many times made general statements to prisoners about taking responsibility for their actions and accepting the consequences of their behavior, but [she has] never made such statements to any prisoner in relation to a grievance."  Bigelow Affid. ¶ 8.

iv.     However, plaintiff's response calls into question whether defendants "would have taken

the same action in the absence of the protected activity[.]"  *Thaddeus-X*, 175 F.3d at 399.  To

begin, plaintiff's response affidavit calls into question whether and what defendant Stone knew

about plaintiff's possession of masking tape before she issued the ticket.  Plaintiff claims that

from September 2000 up until January 19, 2001, he sent "proposed grievances to [d]efendant

Stone in handmade envelopes[.]" Plaintiff admits that he "used masking tape placed on [his]

footlockers by staff to make these envelopes."  Rsp. Affid. ¶ 10.  Defendant Stone "expressed

increasing distress over [plaintiff's] utilization of the grievance process."  Rsp. Affid. ¶ 11.

Plaintiff disputes defendant Stone's representation that he was placed on modified grievance

access in October 2000 for filing grievances in violation of the MDOC grievance policy and

maintains that "[t]he grievance restriction was imposed in bad faith solely to obstruct [his] access

to the grievance process."  Rsp. Affid. ¶ 18.  In response to the suggestion that defendant Stone

was required to write the major misconduct ticket for possession of dangerous contraband,

plaintiff asserts that defendant Stone "was fully informed prior to issuing the ticket that the tape

in question had been provided to [him] by prison staff and that [he] therefore had authorization

to possess the tape."  Rsp. Affid. ¶ 16.  Plaintiff basically asserts the same with regard to

defendant Stone's representation that the ticket was pulled based upon post-ticket information

from the Hearing Investigator.  Rsp.  Affid. ¶ 17.  Also, the ticket was false and inaccurate

because it "omitted the known fact that [plaintiff] had authorization to possess the tape in

question."  Rsp. Affid. ¶ 16.

Also, plaintiff's affidavit argues that Shaw, Lewis and Bigelow had previous knowledge

of plaintiff's "authorized" possession of masking tape.  Plaintiff claims that he has been

transferred about seventy (70) times and that each time MDOC staff put masking tape on his

footlockers and boxes containing legal and personal property for purposes of sealing and

identifying them.  Rsp. Affid. ¶ 6.  When he was assigned to the 800 housing unit in September

2000, defendant Shaw examined plaintiff's property and "took no issue with the masking tape

and released the footlockers to [plaintiff] with the tape on them."  Rsp. Affid. ¶ 7.  Furthermore,

during his September 2000 to January 19, 2001 stay in the 800 housing unit, Lewis and Bigelow

shook down plaintiff's property no less than five times and "[n]o issue was taken by either

[Lewis or Bigelow] with the masking tape until January 19, 2001, when the tickets at issue were

written."  Rsp. Affid. ¶ 8.[21]  Plaintiff claims that 800 housing unit staff, including defendants

Lewis, Bigelow and Shaw, denied plaintiff a "sufficient amount of envelopes and writing paper

for personal, legal and institutional correspondence purposes."  He claims to have submitted

grievances to defendant Stone regarding this issue.  Rsp. Affid. ¶ 9.[22]  In response to ¶¶ 9 and 10

of Lewis's affidavit, plaintiff claims the ticket was "untrue and inaccurate[,]" noting that

defendant Lewis "omitted the known fact that [plaintiff] had authorization to possess the tape in

question."  Rsp. Affid. ¶ 22.  In response to ¶ 11 of Shaw's affidavit, plaintiff states: "the fact

that [he] had authorization to possess the tape in question was known to [d]efendants prior to

issuance of the tickets.  Further, the tape 'was clearly placed there by DOC staff' as indicated by

---

[21]Plaintiff claims that defendants Lewis and Bigelow "were regular unit officers[.]" Rsp. at
2.

[22]Also, in his February 14, 2001 supplemental declaration filed on March 8, 2001 in Case
No. 95-00571, *Scott v. Churchill*, Western District of Michigan, plaintiff claims that staff at SRF
"have refused to provide [him] with sufficient writing paper, postage and photocopying service for
legal purposes without an order from Judge Peter D. Houk instructing them to do so."  (Rsp. Ex. 1
at 5 ¶ 24).

Hearing Investigator Freed in his January 23, 2001 memo." Rsp. Affid. ¶ 23.  *See also* Rsp. Affid. ¶ 12.[23]

In light of plaintiff's response affidavit, the Court should agree with plaintiff that his "verified complaint and affidavit . . . are squarely contradictory to the [d]efendants['] affidavits as to what was told to plaintiff by [d]efendants in connection with the tickets in question and their motive in the issuance of the tickets." Rsp. at 11-12.  Such a conclusion would recognize that, "[a]lthough an issue involving a person's state of mind is not necessarily inappropriate for summary judgment, state of mind is typically not a proper issue for resolution on summary judgment." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (quotations and citations omitted).

Therefore, the Court should conclude that plaintiff's First Amendment retaliation claim against defendants survives summary judgment.

**5.     To the extent it is brought pursuant to § 1983, the Court should conclude that plaintiff's conspiracy claim survives summary judgment.**

**a.     The parties' arguments**

Plaintiff alleges that Stone "met, consulted and struck an agreement with [d]efendants Lewis, Bigelow and Shaw to issue, cause to issue, and aid in issuing [two major misconduct] charges [for possession of dangerous contraband]." Compl. ¶ 12.  Furthermore, plaintiff has alleged that each of the four defendants made a statement to him regarding grievances. Compl. ¶ 14.

_____

[23]Additionally, referencing the alleged comments set forth at Compl. ¶ 14(b)-14(d), plaintiff claims that defendants Lewis, Bigelow and Shaw's statements signify "their actions to be in retaliation for plaintiff's grievance activities."  Rsp. at 4-5.

Plaintiff brings a conspiracy claim.  Compl. ¶¶ 27-32.  He claims that defendants' actions are not legal and violate his First Amendment right to petition the government for redress. Compl. ¶ 28.  He alleges that "[d]efendants conspired with each other to injure Plaintiff by framing plaintiff by filing and causing to file false major misconduct charges as otherwise alleged above."  Compl. at 7 ¶ 29.  Plaintiff claims that defendants "agreed with each other upon a single plan to injure [p]laintiff by the unlawful actions alleged above."  Compl. at 8 ¶ 30.  He also claims that defendants "committed the overt acts described above in further[a]nce of the conspiracy."  Compl. at 8 ¶ 31.  Plaintiff contends that the conspiracy and defendants' illegal, wrongful and tortious acts resulted in plaintiff suffering and sustaining damages including fear, anxiety, interference with his exercise of constitutional rights, and a significant risk of additional punishment, loss of privileges and loss of liberty."  Compl. at 8 ¶ 32.

Defendants contend that "[p]laintiff offers just his speculative statement, but no evidence, that the defendants conspired with one another to issue the charges."  Mtn. Br. at 5.  Specifically, they argue that "[p]laintiff's conclusory allegations are insufficient to sustain a claim of conspiracy among the defendants to issue the two misconduct charges on January 19, 2001." Mtn. Br. at 6-7.  Defendants note: "Plaintiff has not offered any facts to suggest that Stone and Lewis, who wrote the two tickets at issue[], acted together or in concert with Bigelow and Shaw. In fact, there are no overt actions by Bigelow and Shaw as to either ticket, and no overt action by Lewis as to Stone's ticket, or as to Stone as to Lewis's ticket."  Mtn. Br. at 6.  Defendants respond that plaintiff's conspiracy claim should be dismissed, "[b]ecause [p]laintiff's allegations are conclusory, because there is no evidence to support a conspiracy, and because defendants have denied any conspiracy[.]"  Mtn. Br. at 7.

**b.      Plaintiff has not stated a conspiracy claim pursuant to 42 U.S.C. § 1985.**

42 U.S.C. § 1985 governs "Conspiracy to interfere with civil rights".  With regard to

"depriving persons of rights or privileges", the statute provides:

> If two or more persons in any State or Territory conspire or go in disguise on the
> highway or on the premises of another, for the purpose of depriving, either
> directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; or for the purpose of
> preventing or hindering the constituted authorities of any State or Territory from
> giving or securing to all persons within such State or Territory the equal
> protection of the laws; or if two or more persons conspire to prevent by force,
> intimidation, or threat, any citizen who is lawfully entitled to vote, from giving
> his support or advocacy in a legal manner, toward or in favor of the election of
> any lawfully qualified person as an elector for President or Vice President, or as a
> Member of Congress of the United States; or to injure any citizen in person or
> property on account of such support or advocacy; in any case of conspiracy set
> forth in this section, if one or more persons engaged therein do, or cause to be
> done, any act in furtherance of the object of such conspiracy, whereby another is
> injured in his person or property, or deprived of having and exercising any right
> or privilege of a citizen of the United States, the party so injured or deprived may
> have an action for the recovery of damages occasioned by such injury or
> deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  "[C]onclusory allegations are not sufficient to state a claim under 42

U.S.C. §§ 1985(3)[.]"  *Blackburn v. Fisk University*, 443 F.2d 121, 124 (6th Cir. 1971).  "[W]e

are required to accept only well pleaded facts as true, not the legal conclusions that may be

alleged or that may be drawn from the pleaded facts."  *Blackburn*, 443 F.2d at 124 (internal

citations omitted).

"[T]o make out a violation of § 1985(3) . . . the plaintiff must allege and prove four

elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person

is either injured in his person or property or deprived of any right or privilege of a citizen of the

41

United States." *United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-829 (1983).[24]

As to the second element, the Supreme Court has stated that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). "A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender." *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) (citing *Hicks v. Resolution Trust Corporation*, 970 F.2d 378, 382 (7th Cir.1992)). *See also Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973) ("§ 1985(3)'s protection reaches clearly defined classes, such as supporters of a political candidate. If a plaintiff can show that he was denied the protection of the law because of the class of which he was a member, he has an actionable claim under § 1985(3)."); *O'Neill v. Grayson County War Memorial Hospital*, 472 F.2d 1140, 1145 (6th Cir. 1973) ("It is clear from the abovequoted language, however, that the requisite invidiously discriminatory intent must be class-based.").

Assuming plaintiff's conspiracy claim is brought pursuant to 42 U.S.C. § 1985(3), plaintiff has not alleged that the motive for conspiracy was a class based animus. Compl. ¶¶ 27-32. Therefore, the Court should dismiss plaintiff's conspiracy claim pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. *See In re Jackson Lockdown/MCO Cases*, 568 F.Supp. 869, 883 (E. D. Mich. 1983) ("McDonald has not alleged

---

[24]"[C]laims under § 1985(3), unlike those under 42 U.S.C. § 1983, need not allege that the deprivation occurred at the hands of the state." *Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 225 (6th Cir. 1991) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971); *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 832 (1983)). *See also O'Neill v. Grayson County War Memorial Hospital*, 472 F.2d 1140, 1144 (6th Cir. 1973).

that MCO's actions were directed against him simply as a member of the class of prisoners generally but rather 'as a member of a class of inmates at the SPSM'.") (internal footnote omitted).

**c.      Plaintiff has stated a conspiracy claim pursuant to 42 U.S.C. § 1983. [25]**

**i.**      As an initial matter, "[i]t is well-established that the unavailability of a conspiracy claim under § 1985 does not preclude a conspiracy claim under § 1983." *Ahlers v. Schebil*, 966 F.Supp. 518, 536 (E. D. Mich. 1997) (Rosen, J.) (referencing *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir.1989) and *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir.1987)).

There are, at least, two distinctions between conspiracy claims brought under § 1985(3) and those brought under § 1983.  First, "[c]onspiracies to deprive one of his constitutional rights are actionable under Section 1983, and a showing of class-based discrimination is not a prerequisite to liability." *Pizzolato v. Perez*, 524 F.Supp. 914, 923 (E. D. La. 1981) (citing

---

[25]"To demonstrate conspiracy under § 1983, plaintiff must show 'an actual abridgement of some federally-secured right.'"  *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1ˢᵗ 2003) (citing *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir.2001)).  "A conspiracy claim is not actionable without an actual violation of Section 1983."  *Owens v. Board of Regents of Texas Southern University*, 953 F.Supp. 781, 791 (S. D. Tx. 1996) (citing *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir.1990)).  This report and recommendation proceeds with this discussion having shown that plaintiff has stated a First Amendment retaliation claim upon which relief may be granted.

*Pfannstiel* provided that "[o]n appeal from an order denying a motion for summary judgment based on qualified immunity, we review the evidence in the light most favorable to the nonmovant, but the plaintiff has the burden to come forward with summary judgment evidence sufficient to create a genuine issue as to whether the defendant's conduct was objectively unreasonable in light of clearly established law."  *Pfannstiel*, 918 F.2d at 1183.  Later, mentioning *Pfannstiel* and relying in part on *Siegert v. Gilley*, 500 U.S. 226 (1991), the Fifth Circuit stated that "[b]ecause the methodology for reviewing a qualified immunity defense has changed, we first examine the extant case law to ascertain the proper analytical structure."  *Duckett v. City of Cedar Park, Texas*, 950 F.2d 272, 276 (5ᵗʰ Cir. 1992).

*Mizell v. North Broward Hospital Dist.*, 427 F.2d 468, 472 (5th Cir. 1970)[26] and *Crowe v.*

*Lucas*, 595 F.2d 985, 990 (5th Cir. 1979)).[27]  Second, "the plaintiff must show that the defendant

deprived him of this constitutional right 'under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory.'  This . . . requires that the plaintiff show that the

defendant acted 'under color of law.'"  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970).

"To establish a civil conspiracy under § 1983, Plaintiff has the burden of showing (1) that

two or more people entered into an agreement to violate the victim's civil rights, (2) that the

alleged co-conspirators shared in the general conspiratorial objective, and (3) that an overt act

was committed in furtherance of the conspiracy that caused injury to him."  *Pizzuto v. County of*

*Nassau*, 239 F.Supp.2d 301, 308 (E. D. N. Y. 2003).

**ii.**     Defendant Stone denies "striking an agreement with RUO Lewis, RUO Bigelow or

ARUS Shaw regarding misconduct charges, as alleged in ¶¶ 12 and 15 of the Complaint."  Stone

Affid. ¶ 4.  Defendant Lewis states that "[t]here was no conspiracy involved", and he "did not

conspire with defendants Stone, Bigelow, or Shaw to write the major misconduct on January 19,

2001."  Lewis Affid. at 2 ¶¶ 6, 7.  Defendant Shaw states that she "did not conspire with any

---

[26]"[T]o the extent *Mizell* stands for the general proposition that a federal rule on tolling state statutes of limitations should be formulated and applied in civil rights cases, we decline to follow that decision. Such a principle would be in conflict with *Auto Workers v. Hoosier Cardinal Corp.*, 1966, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192.  Moreover, *Mizell* may no longer be sound law in the Fifth Circuit. The court in *Blair v. Page Aircraft Maintenance, Inc.*, 5 Cir. 1972, 467 F.2d 815, refused to fashion a federal tolling rule and relied on the limitation period and tolling principles prescribed by the state." *Ammlung v. City of Chester*, 494 F.2d 811, 816 (3d Cir. 1974).

[27]*But see Johnson-Kirk v. OB GYN Womenservices, P.C.*, No. 93-CV-0702E(F), 1995 WL 307589, *3 (W.D.N.Y. May 15, 1995) (allegation of class-based animus is required for state involvement conspiracy); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) ("we previously have applied the racial or class-based animus requirement to claims of conspiracy under color of state law.").

other staff member to have these two tickets written in order to 'purposefully or maliciously endanger the loss of liberty' of prisoner Scott, or to diminish his chances of parole or increase his security level, as alleged in ¶ 16 of the lawsuit." She maintains that "[t]he tickets were written only because prisoner Scott had violated MDOC policy by being in possession of dangerous contraband, that is, masking tape." Shaw Affid. ¶ 17. In response to ¶ 12 of plaintiff's complaint, defendant Bigelow states that she did not meet with defendant Stone and did not meet with defendants Lewis or Shaw. (Doc. Ent. 20 Bigelow Affid. ¶ 3). She also states that she "did not aid anyone or conspire with anyone to write misconducts against prisoner Scott." Bigelow Affid. ¶ 4.

In response to defendants' motion, plaintiff argues that he "has alleged facts sufficiently establishing his conspiracy claim[.]" Rsp. at 16-17. According to plaintiff, his complaint and affidavit specifically recount "conversations [and] comments . . . between and by the [d]efendants" which connect them to "a grand scheme to frame the [p]laintiff with issuance of false major misconduct tickets in retaliation for plaintiff's grievances and lawsuits." Rsp. at 16-17. He argues that "[b]etween the record evidence and the inferences that can reasonably be made in this matter, it cannot be properly said that [p]laintiff's conspiracy claim is conclusory or unsupported." Rsp. at 17.

In the affidavit attached to plaintiff's response, plaintiff outlines his January 19, 2001 meeting with defendant Stone and the alleged same day meeting of the defendants. Rsp. Affid. ¶¶ 12, 13. Additionally, plaintiff states that he "observed defendants consult with each other and write the false major misconduct tickets to retaliate against [him] for using the grievance process." Rsp. Affid. ¶ 21. *See also* Rsp. Affid. ¶ 26. In response to ¶¶ 15, 16 and 17 of Shaw's

affidavit, plaintiff references his response affidavit at ¶ 13 and states that "the tickets at issue had

no legitimate basis and were purposefully written to retaliate against [him] for exercising

protected rights."  Rsp. Affid. ¶ 25.  In response to ¶¶ 3, 4, 5 and 6 of Bigelow's affidavit,

plaintiff references ¶ 13 of his response affidavit and states that defendant Bigelow "met and

consulted with the other [d]efendants to issue the false tickets in question."  Rsp. Affid. ¶ 26.

"In general, conspiracy claims under § 1983 must be pled with some degree of

specificity. Vague, conclusory allegations unsupported by material facts will not be sufficient to

state a claim for relief."  *Williams v. Kling*, No. 94-1507, 1995 WL 364195, **2 (6th Cir. June

16, 1995) (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir.1987)).  "For a Section 1983

conspiracy to survive a motion for summary judgment, specific facts showing either the

existence or the execution of the claimed conspiracy must be set forth by the plaintiff.

Furthermore, these facts must show overt acts related to the promotion of the conspiracy and

some link between the alleged conspirators. Finally, plaintiff must present facts that the

conspirators agreed to commit an act which deprived the plaintiff of a right, privilege or

immunity secured by the Constitution or the laws of the United States.  It is essential that the

conspiratorial conduct in fact resulted in a violation of plaintiff's constitutional rights."  *Lepley v.

Dresser*, 681 F.Supp. 418, 422 (W. D. Mich. 1988) (internal citations omitted).

It is true that "[a] federal court need not accept as true legal conclusions, or vague and

conclusory allegations of a conspiracy to create a valid claim under § 1983 when none exists."

*Watson v. Lecureux*, No. 93-1542, 1993 WL 473723, **1 (6th Cir. Nov. 15, 1993) (citing

*Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987); *Gutierrez v. Lynch*, 826 F.2d

1534, 1538-39 (6th Cir.1987)).  However, plaintiff has responded to defendants' motion with

46

specific allegations in support of a conspiracy between defendants.  Furthermore, defendants'
and plaintiff's affidavits contradict each other with regard to the existence of a conspiracy to
issue the misconduct tickets at issue.  Additionally, the Sixth Circuit has stated:  "A civil
conspiracy is an agreement between two or more persons to injure another by unlawful action.
Express agreement among all the conspirators is not necessary to find the existence of a civil
conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of
the participants involved. All that must be shown is that there was a single plan, that the alleged
coconspirator shared in the general conspiratorial objective, and that an overt act was committed
in furtherance of the conspiracy that caused injury to the complainant."  *Weberg v. Franks*, 229
F.3d 514, 526 (6th Cir. 2000).  "'Rarely in a conspiracy case will there be direct evidence of an
express agreement among all the conspirators to conspire, ... circumstantial evidence may
provide adequate proof of conspiracy.'"  *Weberg*, 229 F.3d at 528 (referencing *Bell v. City of
Milwaukee*, 746 F.2d 1205, 1255 (7th Cir.1984)[28]).

Therefore, the Court should conclude that, to the extent it is brought pursuant to § 1983,
plaintiff's conspiracy claim survives summary judgment.[29]

---

[28]"We therefore overrule our decision in *Bell* insofar as it recognized a constitutional right
to recover for the loss of the companionship of an adult child when that relationship is terminated
as an incidental result of state action."  *Russ v. Watts*, 414 F.3d 783, 791 (2005).

[29]Because it is not raised by defendants, this report and recommendation does not examine
the impact of an "intra-corporate conspiracy" in this case.  *See Johnson v. Hills & Dales General
Hospital*, 40 F.3d 837, 839 (6th Cir. 1994); *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir.
1999) ("According to the intracorporate conspiracy doctrine, members of the same legal entity
cannot conspire with one another as long as their alleged acts were within the scope of their
employment."), *abrogated on other grounds*, 534 U.S. 506 (2002); *Knapp v. City of Columbus*, 2002
WL 193849, *7 (S. D. Ohio Jan. 17, 2002) ("The intra-corporate conspiracy doctrine therefore
applies and bars Plaintiffs' [§ 1985] claim."); and *Turner v. Viviano*, No. 04-CV-70509-DT, 2005
WL 1678895, *13 (E. D. Mich. July 15, 2005) ("The Sixth Circuit has adopted the intracorporate
(continued...)

**6.      Defendants are not entitled to qualified immunity.**

**a.      Qualified immunity generally**

The Supreme Court has stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978) and *Wood v. Strickland,* 420 U.S. 308, 322 (1975)) (footnote omitted.) "[Q]ualified immunity would be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took action *with the malicious intention* to cause a deprivation of constitutional rights or other injury[.]'" *Harlow*, 457 U.S. at 815 (citing *Wood*, 420 U.S. at 322).

The doctrine of qualified immunity is intended to protect public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806.  The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?; and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in light of this clearly established right?  *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996).  Ultimately, "the burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity."  *Gardenhire v. Schubert*, 205 F.3d

---

[29](...continued)
conspiracy theory which posits that a corporation cannot conspire with itself.") (citing *Doherty v. American Motor Corp.*, 728 F.2d 334, 339 (6th Cir.1994)).

303, 311 (6th Cir. 2000) (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

**b.      Parties' arguments**

Defendants argue that "[i]f a defendant's conduct does not violate a clearly established constitutional right, the defendant is entitled to qualified immunity."  Mtn. Br. at 9-11. Defendants maintain that defendants Stone and Lewis "issued the two major misconduct tickets because [p]laintiff knowingly possessed contraband masking tape, a 'dangerous tool' in security Level II.  Irrespective of any First Amendment activity, [p]laintiff's possession of the tape violated MDOC policy, and the tickets were justified."  Mtn. Br. at 10.  Defendants claim that "[t]he facts of this case do not support [p]laintiff's retaliation claim or his claim that the defendants conspired with each other to retaliate against him by issuing the two tickets." Defendants argue that "[t]here is no showing that the defendants violated any clearly established constitution[al] right[;]" "there is no genuine issue of material fact[;]" and defendants' had substantial grounds to conclude that their acts were justified under *Saucier*, 533 U.S. 194, 208. Mtn. Br. at 11.

Plaintiff claims that "mere possession of contraband in and of itself by a prisoner is not sufficient basis for disciplinary action. . . . the possession must be without prison staff authorization before the prisoner can properly be cited for a rule infraction."  Plaintiff claims that MDOC Staff's placement of masking tape on his footlockers, resulting in plaintiff's authorization to possess the masking tape, "was not a fact later learned by the [d]efendants, but was known at the time the tickets were issued."  Rsp. at 15.  Plaintiff also argues that the misconduct issued by defendant Stone "would have been invalid in any event since plaintiff no

49

longer was in possession of the tape that was the subject of that ticket." Rsp. at 15-16. In response to ¶¶ 15 and 16 of defendant Stone's affidavit, plaintiff states that "[i]n issuing the false major misconduct ticket, [Stone] acted in bad faith and outside the scope of her authority as grievance coordinator." Rsp. Affid. ¶ 20.

**c.     Analysis**

The defense of qualified immunity should only be addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted. "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). If the Court agrees with the conclusion in Sections II.D.4 ( regarding retaliation) and II.D.5 (regarding conspiracy) of this report, it is then appropriate to consider whether defendants are entitled to qualified immunity.

That being said, the crux of defendants' qualified immunity argument is that their conduct did not violate the constitution. They do not argue that the rights against retaliation and conspiracy were not clearly established at the time in question.

True, defendants rely upon *Saucier's* conclusion that "circumstances . . . disclose[d] substantial grounds for the officer to have concluded he had legitimate justification under the law for acting as he did." *Saucier*, 533 U.S. at 208; Mtn. Br. at 11. However, although they argue that the possession of dangerous contraband tickets were issued because plaintiff did, in fact, possess masking tape, Rsp. Br. at 8-9, plaintiff has sufficiently called into question defendants'

motives for the issuance of the major misconducts at the time in question.  "[W]hether an official

protected by qualified immunity may be held personally liable for an allegedly unlawful official

action generally turns on the 'objective legal reasonableness' of the action[.]"  *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987) (citing *Harlow*, 457 U.S. at 819).  *See also Estate of*

*Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (referencing *Harlow*, 457 U.S. at 819).

If the Court agrees with this report's conclusion that there is a question of material fact regarding

the causation element of plaintiff's First Amendment retaliation claim - the reason that

defendants issued these tickets when they did - then the Court should conclude that awarding

summary judgment on the basis that defendants' actions were "objectively reasonable" would be

inappropriate at this time.  *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991) (Summary

judgment is not appropriate where "there are factual disputes on which the issue of immunity

turns such that it cannot be determined before trial whether the officers did acts which violate

clearly established rights.").

**7.    Defendants' request for costs and fees is premature.**

Defendants seek entry of an order granting summary judgment in favor of defendants and

assessing costs and fees.  Mtn. at 2.  The request for costs and fees is premature.  Should the

Court enter judgment in favor of defendants, they may present a bill of costs to the clerk of the

Court pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d)(1).  If defendants seek attorney

fees pursuant to 42 U.S.C. § 1988, they should follow the procedure set forth in Fed. R. Civ. P.

54(d)(2).

**III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS:</u>**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated 1/31/06

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on January 31, 2006.

s/Eddrey Butts
Case Manager